**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES OF AMERICA

    -against-

                                        CASE NO.: 18-20312-CR-COOKE

FRANK ROBERTO CHATBURN RIPALDA

        Defendant,

_____

EMPRESA PÚBLICA DE HIDROCARBUROS
DEL ECUADOR – EP PETROECUADOR,

        Petitioner-Victim.

_____ /

**PETITIONER VICTIM PETROECUADOR'S MEMORANDUM OF LAW IN SUPPORT**
**OF MOTION FOR RECOGNITION OF ITS RIGHTS AS A VICTIM**
**AND ENTITLEMENT TO RESTITUTION**

SQUIRE PATTON BOGGS (US) LLP
200 South Biscayne Boulevard, Suite 4700
Miami, FL 33131
T.: 305 577 7000

Counsel for Petitioner-Victim
*Empresa Pública de Hidrocarburos del*
*Ecuador – EP Petroecuador*

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ............................................................................................... 1

II. BACKGROUND FACTS ................................................................................... 2

    A.  Petroecuador was the victim of a complex, transnational corruption scheme ........... 2

        1.  The Duration of and Participants in the Illegal Bribery Scheme ............... 4

        2.  In May 2016, Petroecuador First Learned of the Scheme; it Immediately Contacted the Prosecutors and Actively Promoted Criminal Investigations and Prosecutions .................................................. 6

        3.  The *modus operandi*: the Co-conspirators Acted in Concert to Violate Petroecuador's Internal Procedures, Avoid Detection, and Conceal their Scheme ............................................................................... 8

    B.  Chatburn Played an Active Role in the Illegal Bribery Scheme, Directly Causing Losses to Petroecuador ............................................................................. 13

III. ARGUMENT ..................................................................................................... 14

    A.  Petroecuador is entitled to the rights of a victim under the MVRA and CVRA ...... 14

    B.  No exception exists here to the right to victim restitution under the MVRA ........... 18

    C.  The amount of Petroecuador's losses subject to restitution ..................................... 18

IV. CONCLUSION ................................................................................................... 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Atl. States Cast Iron Pipe Co.*,
  612 F. Supp. 2d 453 (Dist. N.J. 2009) ...................................................................17

*United States v. Collins*,
  854 F.3d 1324 (11th Cir. 2017) ............................................................................14

*United States v. Credit Suisse AG*,
  Case No. 1:14cr188, 2014 U.S. Dist. LEXIS 144179 (E.D. Va. Sept. 29, 2014)....................17

*United States v. Diaz*,
  245 F.3d 294 (3d Cir. 2001)...................................................................................15

*United States v. Dickerson*,
  370 F.3d 1330 (11th Cir. 2004) ............................................................................15

*United States v. Hughey*,
  147 F.3d 423 (5th Cir. 1998) ................................................................................15

*United States v. Lawrence*,
  189 F.3d 838 (9th Cir. 1999) ................................................................................15

*United States v. Luis*,
  765 F.3d 1061 (9th Cir. 2014) ..............................................................................15

*United States v. Bengis*,
  Case No. 03-CR-308 (LAK) (AJP) (S.D.N.Y 2006) ...........................................15

*United States v. Bengis*,
  631 F.3d 33, 41 (2d Cir. 2011)..............................................................................15

*United States v. Reifler*,
  446 F.3d 65, 120-21 (2d Cir. 2006) ......................................................................15

*United States v. Harris*,
  60 F. Supp. 2d 169, 176 (S.D.N.Y. 1999) ...........................................................15

*Fed. Ins. Co. v. United States*,
  882 F. 3d 348, 357 (2d Cir. 2018).........................................................................16

*United States v. Maturin*,
  488 F.3d 657 (5th Cir. 2007) ................................................................................15

*United States v. Peterson*,
   538 F.3d 1064 (9th Cir. 2008) ............................................................................15

*United States v. Puentes*,
   803 F.3d 597 (11th Cir. 2015) ............................................................................15

*United States v. McNair*,
   605 F.3d 1152, 1221 (11th Cir. 2010) ...........................................................11, 19

*United States v. Vaghela*,
   169 F.3d 729, 736 (11th Cir. 1999) ...............................................................11, 19

*United States v. Napout*,
   Case No. 15-CR-252 (PKC) 2018 U.S. Dist. LEXIS 198206 (E.D.N.Y Nov.
   20, 2018) .............................................................................................................19

*United States v. Fiorentino*,
   149 F. Supp. 3d 1352, 1358-59 (S.D. Fla. 2016) ...............................................20

*United States v. Odom*,
   252 F.3d 1289, 1298 (11th Cir. 2001) ...............................................................20

**Statutes**

18 U.S.C. 3663A(a)(2) ...........................................................................................14, 15

18 U.S.C. §§ 3663, and 3664 ...................................................................................1, 3

18 U.S.C. § 3664(h) .....................................................................................................1

18 U.S.C. § 3771(a)(1), (3)-(6) ..................................................................................17

18 U.S.C. § 3771(e) ...................................................................................................16

Crime Victims' Rights Act, 18 U.S.C. § 3771...............................................................1

Foreign Corrupt Practices Act ................................................................................1, 14

Mandatory Victims Restitution Act, 18 U.S.C. §§ 3663 *et seq.* ........................... *passim*

**Other Authorities**

150 Cong. Rec. S10912 (daily ed. Oct. 9, 2004) (statement of Sen. Kyl) ....................16

## I.  INTRODUCTION

Empresa Pública de Hidrocarburos del Ecuador – EP Petroecuador ("Petroecuador") is the principal corporate victim of Defendant Frank Roberto Chatburn Ripalda's ("Chatburn") criminal conduct and has suffered financial losses as a direct result of Chatburn's and his co-conspirators' criminal acts.  Defendant Chatburn participated in an illegal bribery and money laundering scheme committed by a closely-knit group of individuals that included bribe-receiving corrupt Petroecuador former employees, bribe-paying owners of companies that benefited from corruption-induced Petroecuador contracts, and associated financial professionals who assisted in concealing and laundering both the bribes received by the corrupt employees and the payments made on the corruption-induced contracts.  Defendant Chatburn was an integral part of the scheme.

As discussed below, the following essential facts are indisputable: (*i*) Petroecuador did not know of the illegal bribery scheme until the publication of the Panama Papers in May 2016; (*ii*) Petroecuador contacted the Ecuadorian prosecutors and actively participated in and promoted the ensuing criminal investigations and prosecutions, becoming a criminal complainant itself; and (*iii*) while it lasted, the scheme was successful precisely because it was concealed from Petroecuador and the Ecuadorian authorities, with significant elements of it taking place outside of Ecuador, including in the United States, Panama, and other jurisdictions.

Through his admitted criminal conduct, Chatburn actively promoted, facilitated, and furthered the illegal bribery scheme that proximately caused Petroecuador's losses.  Under the admitted facts of this case, as further detailed below, Petroecuador qualifies as a victim of Chatburn's criminal conduct under the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. §§ 3663 *et seq.*, and the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771.  As a victim, pursuant to 18 U.S.C. § 3664(h), Petroecuador is entitled to the recognition of its rights, and to

joint and several restitution from Chatburn and his convicted co-conspirators for the losses it suffered.

## II.    BACKGROUND FACTS

Chatburn is a dual United States and Ecuadorian national.  *See United States v. Frank Roberto Chatburn Ripalda*, Factual Proffer in Support of Guilty Plea ("Chatburn Factual Proffer") at 1 [DE-213].  On April 19, 2018, the United States charged Chatburn and his co-conspirator José Larrea ("Larrea") in a five-count Indictment [DE-3] with conspiracies to violate the Foreign Corrupt Practices Act ("FCPA"), to commit money laundering, and to promote and conceal money laundering.  On September 14, 2018, Larrea pleaded guilty to one count of conspiracy to money launder.  [DE-81].  On December 14, 2018, the United States filed a nine-count Superseding Indictment against Chatburn.  [DE-105].  On November 10, 2019, Chatburn pleaded guilty to count two of the Superseding Indictment, conspiracy to commit money laundering.  [DE-212].  His sentencing is scheduled for December 18, 2019.  [DE-211].

### A.    Petroecuador was the victim of a complex, transnational corruption scheme

The following facts are largely taken from the findings of the Honorable Magistrate Judge Otazo-Reyes in the Report and Recommendation entered in *United States v. Juan Andres Baquerizo Escobar*, Case No. 17-CR-20596 (DPG), S.D. Fla., and the evidentiary hearing held in that case on Petroecuador's similar Motion for Recognition of its Rights as Victim and Entitlement to Restitution.[1]  Baquerizo is a convicted co-conspirator in the same conspiracy as here, his case involving many facts relevant here.[2]

_____

[1] The Report and Recommendation recommended denying Petroecuador's Motion, to which Petroecuador recently filed objections that are still pending.  Petroecuador's objections concern the legal analysis and conclusions, not the factual findings.  No party has objected to the factual findings in the Report and Recommendation.

[2] Petroecuador seeks to present evidence in this case, as it did in the Baquerizo case.

Petroecuador is an Ecuadorian corporation with its own juridical personality, ultimately owned by the Republic of Ecuador.  Petroecuador is commercially driven and its day-to-day activities are of a private, commercial nature.  From 2012-2016, the relevant time period here, Petroecuador had more than 8,000 employees and annual revenue exceeding $9.6 billion. Petroecuador has a Board of Directors, which sits atop its corporate structure and oversees the General Manager, who is in charge of the company's day-to-day operations.[3]

Petroecuador has four lines of business, each headed by a Division Manager.  These are: (1) the Division of International Commerce, which is in charge of the sale internationally of crude oil (this is the largest and most profitable Division, generating more than 70% of Petroecuador's $9.6 billion in annual revenue); (2) the Division of Transportation, which is in charge of transporting crude oil domestically within Ecuador from the point of extraction to its final destination; (3) the Division of National Commerce, which is in charge of selling within Ecuador the products refined by the Division of Refining; and (4) the Division of Refining, which is in charge of producing refined crude oil products needed to meet the country's internal demand (this division constitutes approximately 5% of Petroecuador's annual revenue, the least of all four divisions).  The corrupt conduct at issue here relates solely to the Division of Refining.

Petroecuador regularly procures from outside vendors goods and services needed for its business operations.  Criminal investigations in Ecuador and the United States have established that for a period of approximately four years, from 2011 to 2016, a discreet group of Petroecuador

---

[3] Attached as composite Exhibit 1 are the following documents published on Petroecuador's website: (1) Petroecuador's organizational chart, in its original Spanish-language version; and (2) Petroecuador's 2018 year-end Report of Operations (in Spanish, *Informe de Gestión*), which details the company's financial results and describes its internal structure and operations.  Petroecuador is working on English translations of the organizational chart and of the most relevant sections of the *Informe de Gestión*, and will file those translations with the Court as soon as they are finalized.

employees, all assigned to the Division of Refining, accepted bribes from some vendors in exchange for Petroecuador contacts.  Unknowingly, Petroecuador paid more than $66 million on those corruption-induced contracts, mainly to two vendors: GalileoEnergy, S.A. ("Galileo") and Oil Services & Solutions, S.A. ("OSS").  In exchange for illegally awarding those contracts, the corrupt employees received millions in bribes, paid mostly outside of Ecuador through shell companies incorporated in Panama, Grand Cayman, the British Virgin Islands, Bahamas, and other tax havens.

**1.     The Duration of and Participants in the Illegal Bribery Scheme**

The United States has defined the "illegal bribery scheme" as being of a definite duration, extending from around 2012 through 2016.  In addition to Chatburn, several other individuals have been charged in the United States in connection with the illegal bribery scheme.  The group of US defendants includes two former Petroecuador mid-level employees, Marcelo Reyes López[4] and Arturo Escobar Domínguez,[5] and the owners of OSS (Juan A. Baquerizo[6]) and GalileoEnergy

---

[4] Reyes, a former in-house counsel with the Division of Refining at Petroecuador who accepted $2.1 million in bribes, pleaded guilty to conspiracy to money launder.  *See United States v. Marcelo Reyes Lopez*, Case No. 17-CR-20747 (KMW), S.D. Fla., Gov't's Opp. to Def's Mot. for Downward Departure, July 18, 2018, at 2, attached as Exhibit 3; *United States v. Marcelo Reyes Lopez*, Case No. 17-CR-20747 (KMW), S.D. Fla., Criminal Indictment, October 24, 2017, attached as Exhibit 2.

[5] Escobar, a former General Coordinator of Business Management with the Division of Refining at Petroecuador who accepted $1.9 million in bribes, pleaded guilty to conspiracy to money launder.  *See United States v. Arturo Escobar Dominguez*, Case No. 18-CR-20108 (CMA), S.D. Fla., Factual Proffer in Support of Guilty Plea, March 28, 2018, at 2, attached as Exhibit 5; *United States v. Arturo Escobar Dominguez*, Case No. 18-CR-20108 (CMA), S.D. Fla., Criminal Information, February 20, 2018, attached as Exhibit 4.

[6] Baquerizo owned OSS, an Ecuadorian company that received $43.4 million in Petroecuador corruption-induced.  Baquerizo admitted paying $1.72 million in bribes to corrupt Petroecuador employees, although the United States explained that figure "likely underrepresents the full severity of the defendant's conduct."  *United States v. Juan Andres Baquerizo Escobar*, Case No. 17-CR-20596 (DPG), S.D. Fla., Gov't's Resp. to Def.'s Objections to PSI Report and Sentencing Memorandum, at 6, 8, attached as Exhibit 8.  Baquerizo pleaded guilty to conspiracy to money launder.  *See United States v. Juan Andres Baquerizo Escobar*, Case No. 17-CR-20596

(Ramiro A. Luque[7]) and their respective associates (Chatburn, José Larrea,[8] Gustavo Trujillo,[9] José Cisneros[10] and Armengol A. Cevallos[11]).

In connection with the same illegal bribery scheme, prosecutors in Ecuador successfully brought criminal charges against former Petroecuador employees Carlos Pareja Yannuzzelli

---

(DPG), S.D. Fla., Factual Proffer in Support of Guilty Plea, September 14, 2018, attached as Exhibit 7; *United States v. Juan Andres Baquerizo Escobar*, Case No. 18-CR-20596 (DPG), S.D. Fla., Criminal Information, July 11, 2018, attached as Exhibit 6.

[7] Luque co-owned GalileoEnergy, an Ecuadorian company that received $39.8 million in Petroecuador corruption-induced contracts.  Luque paid $3.7 million in bribes to corrupt Petroecuador employees, and pleaded guilty to conspiracies to violate the FCPA and to money launder.  *See United States v. Ramiro Andres Luque Flores*, Case No. 17-CR-00537 (CBA), E.D.N.Y., Minute Entry of proceedings held before Magistrate Judge Sanket J. Bulsara, October 6, 2017, attached as Exhibit 10; *United States v. Ramiro Andres Luque Flores*, Case No. 17-CR-00537 (CBA), E.D.N.Y., Criminal Information, October 6, 2017, attached as Exhibit 9.

[8] Larrea pleaded guilty to conspiring with Chatburn and others to launder bribe money. *See United States v. José Larrea*, Case No. 18-CR-20312 (MGC), S.D. Fla., Factual Proffer in Support of Guilty Plea, September 14, 2018, attached as Exhibit 13; *United States v. Jose Larrea*, Case No. 18-CR-20312 (MGC), S.D. Fla., Criminal Indictment, April 19, 2018, attached as Exhibit 14.

[9] Trujillo pleaded guilty to conspiring with Luque, Larrea, and others to launder bribe money.  *See United States v. Gustavo Trujillo*, Case No. 19-CR-134 (CBA), E.D.N.Y., Minute Entry for proceedings held before Magistrate Judge Sanket K. Bulsara, April 4, 2019, attached as Exhibit 15; *United States v. Gustavo Trujillo*, Case No. 19-CR-134 (CBA), E.D.N.Y., Criminal Information, April 4, 2019, attached as Exhibit 16.

[10] Cisneros pleaded guilty to conspiring with Luque, Cevallos, Reyes and others to launder bribe money. *See United States v. Jose Melquiades Cisneros Alarcon*, Case No. 19-CR-20284, S.D. Fla., Plea Agreement, August 19, 2019, attached as Exhibit 11. *See also United States v. Jose Melquiades Cisneros Alarcon*, Case No. 19-CR-20284, S.D. Fla., Factual Proffer, August 19, 2019, attached as Exhibit 12.

[11] Cevallos is accused of conspiracies to violate the FCPA and to money launder bribe money with Reyes, Cisneros and others.  *See United States v. Armengol A. Cevallos Díaz*, Case No. 19-20284-CR, S.D. Fla., Criminal Indictment, May 10, 2019, attached as Exhibit 17.  Cevallos is fighting his Indictment

("Pareja");[12] Alex Bravo Panchano ("Bravo");[13] Escobar (also a US defendant); and Paquita Isabel de Mora Guerra ("De Mora").[14]  Ecuadorian prosecutors also charged Luque and Baquerizo.  As explained below, all charges in Ecuador were brought at the prompting of Petroecuador, which became a criminal complainant in the cases, actively assisting the Ecuadorian prosecutors and participating as a victim at all stages of the proceedings, including at trial.

2.    **In May 2016, Petroecuador First Learned of the Scheme; it Immediately Contacted the Prosecutors and Actively Promoted Criminal Investigations and Prosecutions**

Petroecuador first learned of potential irregularities affecting some vendor contracts awarded by the Refining Division in late-2015, when an employee of that Division sent a memorandum to the company's Litigation Department.  An internal investigation was immediately initiated and the matter was also referred to Ecuador National Prosecutor's Office.

In May 2016, while the investigation progressed, the "Panama Papers"[15] were leaked and came to Petroecuador' attention.  The Panama Papers confirmed that Petroecuador employees,

---

[12] Pareja was Manager of the Division of Refining from March 2012 to July 2015, and Petroecuador's General Manager for almost four months, from July 2015 to November 2015.  He was convicted for conduct committed while being Manager of the Division of Refining, a mid-level position.

[13] Bravo was Projects Coordinator for the Refinery of Esmeraldas at the Division of Refining from 2011 to 2015, and Petroecuador's General Manager for almost five months, from November 2015 to April 2016.  He was convicted for conduct committed while being Projects Coordinator at the Division of Refining, a mid-level position.

[14] De Mora was in-house counsel at the Division of Refining from 2004 to 2015.  She was convicted for conduct committed while holding that office.

[15] This was a leak of more than 11.5 million documents of the Panamanian law firm Mossack Fonseca that exposed the offshore dealings and corporate ownership of shell companies by wealthy individuals and public officials from numerous countries.  *See* The Guardian, *What You Need to Know About the Panama Papers*, available at: https://www.theguardian.com/news/2016/apr/03/what-you-need-to-know-about-the-panama-papers; International Consortium of Investigative Journalists, *The Panama Papers: Exposing the Rogue Offshore Finance Industry*, available at: https://www.icij.org/investigations/panama-papers/.

including Pareja and Bravo, owned offshore Panamanian companies.  Petroecuador immediately contacted the Ecuadorian Prosecutors and began working with them to secure additional information about the named individuals' dealings.  As part of those efforts, Petroecuador provided material assistance to the Prosecutors in preparing and canalizing requests for information under Mutual Legal Assistance Treaties (MLATs) that Ecuador has in place with Panama, the United States, Switzerland, China, the United Kingdom, and Bahamas.  Those MLAT requests were supported with information provided by Petroecuador.

Ecuador received responses from Panama, Switzerland, China, and the United Kingdom. That information, in particular the information provided by the Panamanian authorities, established that the Petroecuador employees mentioned above—namely, Pareja, Bravo, and Escobar—owned and operated offshore companies while employed by Petroecuador.  From 2011-2016, those offshore companies received millions in payment from GalileoEnergy and OSS and individuals associated with them.  Most of the payments were made to a bank account at Helm Bank Panama held by GIRBRA, S.A., a Panamanian company beneficially owned by Bravo.  From there, monies were wired to several other bank accounts owned by: (1) Bravo personally and to a separate account held by GIRBRA, S.A. at Capital Bank Panama; (2) Escobar personally; (3) Pareja personally and to an account held in the name of his wife, Yolanda Rosa Pareja, and his son Carlos A. Pareja; and (4) Escart, S.A., a Panamanian company owned by De Mora jointly with Escobar.[16] Payments were also made directly into a separate Panamanian bank account held by CAPAYA,

---

[16] *United States v. Arturo Escobar Dominguez*, Case No. 18-CR-20108 (CMA), Factual Proffer in Support of Guilty Plea, March 28, 2018, Ex. 5, at p. 3 ("The defendant . . . obtained a Panamanian shell company called Escart, S.A. . . . and subsequently opened a Panamanian bank account in Escart's name.").

S.A., an entity owned by Pareja.  Petroecuador was not aware of the existence of these offshore entities or payments, and did not share in these payments either.

Petroecuador became a criminal complainant in all the criminal investigations and proceedings in Ecuador, actively participating in them by offering fact and expert evidence against the defendants.  Under Ecuadorian law and as adjudicated by Ecuadorian courts, Petroecuador is also a designated victim in the proceedings.

### 3. The *modus operandi*: the Co-conspirators Acted in Concert to Violate Petroecuador's Internal Procedures, Avoid Detection, and Conceal their Scheme

The proceedings in Ecuador and the United States have established that the defendants acted in active concert and that each performed a critical role necessary to accomplish the ultimate goal of the scheme: to defraud Petroecuador out of millions of dollars.

### (a) Contracting Procedures Were Violated to Carry Out the Scheme and Avoid its Detection by Petroecuador

The illegal bribery scheme was limited to a few bad actors at the Division of Refining, led by Pareja and Bravo.  As Managers of the Division of Refining, Pareja and Bravo, respectively, had exclusive authority to approve vendor contracts up to the threshold amount of $50 million.[17] None of the contracts involved in the illegal bribery scheme came close to that amount.  The largest main contract was awarded to OSS was for $16.5 million and to Galileo was for $15.5 million. Thus, Pareja and Bravo, while Managers of the Division of Refining, alone could approve the corruption-induced contracts.

Also solely within their control, Pareja and Bravo awarded contracts to the bribe-paying vendors through an exceptional, non-public contracting procedure called in Spanish "*giro*

---

[17] Contracts exceeding $50 million and up to $100 million had to be approved by Petroecuador's General Manager.  Contracts exceeding $100 had to be approved by the Board of Directors.

*específico del negocio*," which loosely translates to "specific line of business."  Pareja and Bravo abused this exceptional procedure, reserved for exigent circumstances, to bypass the statutorily-mandated open competitive bidding process in Petroecuador.  In so doing, they were able to achieve two critical things: (1) unilaterally set the amount of the contract, as long as it fell under the $50 million approval threshold; and (2) hand-pick vendors, regardless of their technical or financial qualifications or past experience with Petroecuador.[18]  The vast majority of the contracts relevant here were awarded through the abuse of this exceptional contracting procedure.  Further, once the contract was awarded, Pareja and Bravo appointed themselves and other subordinate employees also participating in the scheme as "supervisors" or "administrators" of the corruption-induced contract.  This allowed them exclusive supervision and control over the contracts and the vendor's performance thereunder, rendering discovery of the scheme almost impossible.

Pareja, Bravo, and their co-conspirators further sought to conceal the scheme from Petroecuador and the Ecuadorian authorities by using a complex web of offshore shell companies, operating in tax havens, which received bribe money outside of Ecuador.[19]  Some of the corrupt

---

[18] By way of example, before December 2013, when it received its first contract from Petroecuador, OSS was a pharmaceutical distribution company going by the name Tateula, S.A. On March 2011, the Tateula became OSS and shortly thereafter, on April 5, 2011, Baquerizo became its President.  *See* Corporate Resolution appointing Baquerizo President of Oil Services & Solutions, S.A., April 5, 2011, attached as Exhibit 18.

[19] Almost every US defendant has been charged with laundering proceeds of the illegal bribery scheme through the use of offshore companies.  *See, e.g.*, *United States v. Marcelo Reyes Lopez*, Case No. 17-CR-20747 (KMW), United States' Opposition to Defendant's Motion for Downward Variance, July 18, 2018, Ex. 3, at p. 2.

> In addition to being one of several Petroecuador officials who engaged in the bribery conspiracy, the defendant also participated in a subsequent conspiracy that lasted until 2016 to launder the proceeds of the corrupt scheme through property purchases financed by offshore shell companies that used foreign bank accounts, including in the United States.

*See also United States v. Arturo Escobar Dominguez*, Case No. 18-CR-20108 (CMA), Factual Proffer in Support of Guilty Plea, March 28, 2018, Ex. 5, at pp. 3-4:

former employees took further steps to conceal their illegal conduct from Petroecuador and the

Ecuadorian authorities.  For example, Reyes, with whom Chatburn conspired,[20] "waited to take

ownership of several properties [purchased with bribe proceeds], including in Miami . . . until he

was no longer employed by Petroecuador."[21]

(b)     **The Bribes were Factored into the Contract Price**

As charged by the United States and admitted by the convicted US defendants, the corrupt

vendors and employees would agree at the outset on a bribe amount determined as a percentage

(referred to as "commissions" by the co-conspirators)[22] of the value of any corruption-induced

contract.  According to the United States, the percentage was 21% of the value of every contract,[23]

whereas Baquerizo claims he paid 10% of the value of every contract.[24]  Among the documents

---

To further the bribery scheme and conceal its illegal proceeds, the defendant and his co-conspirators, among other things, created shell companies in Panama and opened bank accounts in Panama, Switzerland, and the United States for the purpose of laundering the illicit bribery proceeds.

[20] *See* Chatburn Factual Proffer at 2 (Chatburn wired $700,000 "for the benefit of . . . Marcelo Reyes Lopez").

[21] *United States v. Marcelo Reyes Lopez*, Case No. 17-CR-20747 (KMW), United States' Opp. to Def's Mot. for Downward Variance, July 18, 2018, Ex. 3, at p. 2.

[22] *United States v. Juan Andres Baquerizo Escobar*, Case No. 17-CR-20596 (DPG), S.D. Fla., Sentencing Hr. Tr. at 6(8-9) ("There they call it commissions, but its payment to these individuals in order to win contracts."), attached as Exhibit 19.

[23] *United States v. Marcelo Reyes Lopez*, Case No. 17-CR-20747 (KMW), S.D. Fla., Gov't Opp. to Def's Mot. for Downward Departure, July 18, 2018, Ex. 3, at p. 7, (emphasis added):

Ramiro Luque, a contractor who paid bribes to Reyes López and others, who has pleaded guilty in this matter, told the Government that Reyes-Lopez, was among the "bosses" referred to in a February 2013 email that another EP Petroecuador bribe recipient sent to Luque, and which demanded a *bribe payment of 16% for "bosses" and 5% to "middle management.*"

[24] *United States v. Juan Andres Baquerizo Escobar*, Case No. 17-CR-20596 (DPG), S.D. Fla., Def's Obj. to PSI and Sentencing Memorandum, at p. 10 ("Privately held companies like Mr. Baquerizo's were required to pay the going rate (usually 10% of the contract amount) to the government officials with authority over awarding those contracts."), attached as Exhibit 20.  *See*

Ecuador obtained from the Panama MLAT Request is an Agency Agreement entered between Baquerizo and Bravo whereby the former agreed to pay Bravo "a commission of 10% (or to be agreed on specific contracts) of Gross Invoices amount of each contract."[25]

Because the bribes were baked into the price of each contract and to ensure they would not come out of pocket, vendors would pay the bribe only *after* receiving payment from Petroecuador on the corruption-induced contracts. As Baquerizo's counsel explained at his sentencing, with no objection from the United States:

> ***After*** the contract was awarded, the contract winner, that being Mr. Baquerizo, would then be obligated from the ***proceeds of the contract***, ***so it's not as though there was an upfront payment***. Instead, once the proceeds of the contract had come in, then he was required to make those ***percentage payments out***.[26]

Indeed, there is no reasonable alternative: it defies all logic that someone like Pareja (who accepted bribes and concealed them from Petroecuador) would have demanded an *honest* contract price (without the bribe payment built in) and that people like Chatburn or Luque and others like them simply paid the bribe payments out of their own money, reducing their profit margins by millions. *See*, *e.g.*, *United States v. McNair*, 605 F.3d 1152, 1221 (11th Cir. 2010) ("the [bribing party] essentially recouped their bribe money by adding it back to their sewer and engineering contract bills as a cost of doing business with the County."); *United States v. Vaghela*, 169 F.3d 729, 736 (11th Cir. 1999) (the briber or payer of kickbacks "would not have participated in the

---

*also United States v. Juan Andres Baquerizo Escobar*, Case No. 17-CR-20596 (DPG), S.D. Fla., Gov't's Resp. to Def's Obj. to PSI Report and Sentencing Memorandum, Ex. 8, at pp. 6, 8 (acknowledging that Baquerizo admitted having paid as bribes "usually 10% of the contract amount" on each of his contracts, but stating that Baquerizo's loss figure "likely underrepresents the full severity of the defendant's conduct").

[25] *See* Agency Agreement entered between Juan Andrés Baquerizo and Alex Bravo Panchano, February 10, 2014, at Art. 6(1), attached as Exhibit 21.

[26] *United States v. Juan Andres Baquerizo Escobar*, Case No. 17-CR-20596 (DPG), S.D. Fla., Sentencing Hr. Tr. at 7(12-20), Ex. 19, (emphasis added).

kickback scheme if it was not profitable," and thus the victim was presumably "overcharged in the amount of the kickbacks").

Moreover, the corrupt vendor's illegal conduct did not end with the payment of bribes. The vendors also designed and implemented sophisticated mechanisms to conceal and disguise the proceeds of the illegal bribery scheme thereby promoting and facilitating the overall success of the scheme.[27] As described in Section II.B., *infra*, Chatburn was particularly adept at tactics for concealment.

*      *      *

The above facts establish that Petroecuador was the victim in-fact of Chatburn's and his co-conspirators' conduct. These facts confirm Petroecuador was not aware of, did not participate in, and did not benefit from their illegal conduct. In fact, the United States charged the corrupt vendors with offering and paying bribes to the corrupt employees for the purpose of, among others, "inducing such foreign official to do and omit to do acts in *violation of the lawful duty* of such official" and "securing an improper advantage."[28] The United States made similar statements in

---

[27] *See United States v. Ramiro Andres Luque Flores*, Case No. 17-CR-537 (CBA), Criminal Information, October 6, 2017, Ex. 9, ¶ 18 ("[Luque] and his co-conspirators instructed Petroecuador to make the contract payments into various offshore accounts . . . [and] then sent bribe payments from those offshore accounts to other intermediary and shell companies" beneficially owned by corrupt Petroecuador officials); *United States v. Juan Andres Baquerizo Escobar*, Case No. 17-CR-20596 (DPG), S.D. Fla., Factual Proffer in Support of Guilty Plea, Ex. 7, at p. 2 ("to conceal and disguise the proceeds of the illegal bribery scheme, as well as to promote the illegal bribery scheme," Baquerizo and his co-conspirators "obtained shell companies in the Bahamas and Panama, opened bank accounts in Panama and Switzerland in the names of those shell companies, and transferred the proceeds of the illegal bribery scheme from those shell company bank accounts into Panama-based bank accounts held in the name of shell companies" owned by corrupt Petroecuador officials).

[28] *United States v. Ramiro Andres Luque Flores*, Case No. 17-CR-537 (CBA), Criminal Information, October 6, 2017, Ex. 9, ¶¶ 22(c)(ii)-(iii) (emphasis added). *See also United States v. Frank Roberto Chatburn Ripalda*, Case No. 18-CR-20312 (MGC), Criminal Indictment, April 20, 2018, Ex. 11, at ¶ 2(a)(ii)-(iii) (same).

connection with the corrupt Petroecuador employees, alleging that when Reyes received bribes "for his own benefit from contractors seeking to do business with Petroecuador," he did so "*abusing his public position and influence* within Petroecuador."[29]  For his part Escobar, admitted accepting bribes to "secure an improper advantage" for certain vendors in their dealings with Petroecuador.[30]  In short, the rogue Petroecuador corrupt employees acted outside the scope of their authority and official duties, exclusively for their personal enrichment, and with no intent to benefit Petroecuador.

**B.   Chatburn Played an Active Role in the Illegal Bribery Scheme, Directly Causing Losses to Petroecuador**

Chatburn actively promoted and facilitated the illegal bribery scheme in two ways.  <u>*First*</u>, Chatburn personally facilitated the payment of bribes to corrupt Petroecuador former employees thereby furthering and enabling the illegal bribery scheme.  Chatburn admits that from 2013-2015, he and his co-conspirators paid at least $2.9 million in bribes to secure Petroecuador contracts. *See* Chatburn Factual Proffer at 1-2 [DE-213].  Those bribes were to secure contracts for Luque's GalileoEnergy.  *Id*. at 2.

<u>*Second*</u>, Chatburn assisted Luque and the corrupt Petroecuador employees in laundering the proceeds of the bribery scheme by creating complex offshore structures "designed to conceal and disguise the nature, location, source, ownership, and control of the proceeds of unlawful activity, namely proceeds of the illegal bribery scheme in which Chatburn and Luque had

---

[29] *United States v. Marcelo Reyes Lopez*, Case 17-CR-20747 (KAW), S.D. Fla., Govt's Opp. to Def's' Mot. for Downward Variance, July 18, 2018, Ex. 3, at p. 2.  *See also id*. at p. 4 ("the defendant, together with others, monetized his position of public trust for private gain").

[30] *United States v. Arturo Escobar Dominguez*, Case No. 18-CR-20108 (CMA), Factual Proffer in Support of Guilty Plea, March 28, 2018, Ex. 5, at p. 4.

engaged." *Id*.  Chatburn did so "in an effort to develop illegal business with PetroEcuador officials and assist them in concealing bribe payments." *Id*. at 3.

Because Chatburn was an active, necessary participant in the underlying illegal bribery scheme, Petroecuador is entitled to recover from Chatburn its losses arising from that very same illegal bribery scheme.  Chatburn was a necessary element of the corruption chain that started with the payment of a bribe to a Petroecuador employee, followed with the award of a corruption-induced contract whose price included the value of the bribe, and culminated with the laundering of the illegal gains through offshore entities.  The illegal corruption scheme depended on the success of each element of the scheme, which in turn depended on the involvement of each member of the conspiracy.  Therefore, to the fullest extent, each co-conspirator, jointly, severally, and directly caused Petroecuador's injury in the form of the amount of bribes factored into the price of the contracts and its right to the honest services of its employees.  Injuries for which Petroecuador is entitled to restitution.

## III.    ARGUMENT

### A.    Petroecuador is entitled to the rights of a victim under the MVRA and CVRA

Congress has created a comprehensive statutory framework under the MVRA and CVRA to ensure that crime victims are heard as part of the sentencing process and are awarded certain statutory rights.  Petroecuador qualifies as a victim under both statutes entitled to restitution.

*First*, under the MVRA, a victim is a person "directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered."  18 U.S.C. § 3663A(a)(2). Full restitution is *mandatory* under the MVRA for an "offense against property," including any offense committed by fraud or deceit.  18 U.S.C. § 3663A(c)(ii).  FCPA violations, money laundering, and conspiracy to commit FCPA offenses and money laundering are all offenses subject to mandatory restitution under the MVRA.  *See, e.g., United States v. Collins,* 854 F.3d

1324 (11th Cir. 2017); *United States v. Puentes,* 803 F.3d 597 (11th Cir. 2015); *United States v. Pescatore*, 637 F.3d 128 (2d Cir. 2011); *United States v. Luis*, 765 F.3d 1061, 1066 (9th Cir. 2014); *United States v. Bengis,* 631 F.3d 33, 41 (2d Cir. 2011); *United States v. Peterson*, 538 F.3d 1064, 1075 (9th Cir. 2008); *United States v. Diaz*, 245 F.3d 294, 296 (3d Cir. 2001); *United States v. Bengis,* No. 03-CR-308 (LAK) (AJP), 2006 U.S. Dist. LEXIS 91089, at *17 n.10 (S.D.N.Y. Dec. 19, 2006) (citing *United States v. Harris*, 60 F. Supp. 2d 169, 176 (S.D.N.Y. 1999) (finding that, in addition to other offenses, money laundering is a "crime against property" under the MVRA).

Chatburn's money laundering conspiracy admittedly facilitated and furthered the illegal bribery scheme that proximately caused Petroecuador's losses.  Chatburn's unlawful benefits from his money laundering activities are directly traceable to the proceeds of the illegal bribery scheme that resulted in Petroecuador awarding bribe-inflated corruption-induced contracts.  Accordingly, based on the above authority, Chatburn's money laundering conspiracy is a crime against property under the MVRA in respect of which Petroecuador is entitled to restitution.

Further, where an offense involves as an element "a scheme, conspiracy, or pattern of criminal activity," any person directly harmed by the defendant's criminal conduct in the course of the conspiracy is a victim.  18 U.S.C. § 3663A(a)(2).  *See also United States v. Dickerson,* 370 F.3d 1330 (11th Cir. 2004); *United States v. Reifler*, 446 F.3d 65, 120-21 (2d Cir. 2006); *Bengis*, 631 F.3d at 40; *United States v. Maturin*, 488 F.3d 657, 662 (5th Cir. 2007) ("The MVRA . . . broadens the definition of the term 'victim' for any 'offense that involves as an element a scheme, conspiracy, or pattern of criminal activity' to include 'any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.");  *United States v. Lawrence*, 189 F.3d 838, 846 (9th Cir. 1999); *United States v. Hughey*, 147 F.3d 423, 437 (5th Cir. 1998).  Petroecuador meets the MVRA's definition of victim because it was directly and

proximately harmed by Chatburn's conduct.  As explained above, Chatburn played an integral role in facilitating and furthering the illegal bribery scheme.  By his own admission, Chatburn's actions furthered and continued the illegal bribery scheme that harmed Petroecuador.  *See* Chatburn Factual Proffer at 3 (Chatburn's money laundering activities were "in an effort to develop illegal business with PetroEcuador officials and assist them in concealing bribe payments") [DE-213].

For all of the above reasons, Petroecuador meets the definition of victim under the MVRA and is entitled to mandatory restitution.

*Second*, identical to the MVRA, the CVRA defines a victim as any person "directly and proximately harmed as the result of the commission of a federal offense."  18 U.S.C. § 3771(e). *See, e.g., Fed. Ins. Co. v. United States*, 882 F. 3d 348, 357 (2d Cir. 2018) (noting that the CVRA is the "procedural mechanism to vindicate" the MVRA's substantive right to restitution). Petroecuador is an Ecuadorian corporation and a "person" for purposes of the CVRA.  *See* 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress . . . the word[] 'person' include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies").

Senator Kyl, one of the CVRA's sponsors, explained that the definition of victim creates "an intentionally broad definition because all victims of crime deserve to have their rights protected."  150 Cong. Rec. S10912 (daily ed. Oct. 9, 2004).  The broad "directly and proximately harmed" language accords crime victims' rights to all persons incurring foreseeable harms as a result of a defendant's criminal acts.  Thus, as long as a person "suffers harm as a result of the crime's commission" he, she, or it is a crime victim under the CVRA, regardless of whether a defendant intended to victimize that particular person or entity.  *See In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008).

16

Given that the CVRA was based on the MVRA, including its almost word-for-word definition of victim, courts have routinely held that the CVRA should be interpreted consistently with the MVRA. *See, e.g., United States v. Credit Suisse AG*, Case No. 1:14cr188, 2014 U.S. Dist. LEXIS 144179, at 9* (E.D. Va. Sept. 29, 2014) ("we find our case law construing the VWPA and the MVRA persuasive, both for how the CVRA is to be interpreted procedurally and for when an individual qualifies as a victim of a conspiracy") (quoting *In re McNulty*, 597 F. 3d 344, 350 (6th Cir. 2010); *United States v. Atl. States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453, 460-61 (Dist. N.J. 2009) ("one of the chief sponsors of the [CVRA], Sen. John Kyl, has explained that the CVRA's definition of a crime victim is based on the federal restitution statutes, citing . . . the MVRA") (internal quotations omitted).

Accordingly, as with the MVRA, Petroecuador satisfies all criteria for victim status under the CVRA. As a victim under the CVRA, Petroecuador has the right: (1) not to be excluded from any public court proceeding; (2) to be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding; (3) to confer with the attorneys for the Government in the case and be informed by them; and (4) to be considered by the Court for "full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(1), (3)-(6).[31] The United States' failure to fulfill any of these obligations has hampered Petroecuador's ability timely and adequately to seek restitution against all co-conspirators and ensure that no bad actors remain with the company.

---

[31] These same rights afforded to victims have been emphasized in the recent revisions made to the Department of Justice's US Attorneys' Manual, now renamed the Justice Manual. The Manual adds explicit instructions directing prosecutors to consider the impact on victims when making prosecution, plea agreement, and sentencing decisions, and to consider "[t]he interests of any victims" in deciding whether to initiate or decline prosecution.

**B.**     **No exception exists here to the right to victim restitution under the MVRA**

Courts recognize a co-conspirator exception to the MVRA pursuant to which a putative

victim will be denied restitution when—whether formally charged or not—its conduct rises to that

of an accomplice or coconspirator to the defendant.  As succinctly put by the court in *United States*

*v. Emor*:

> In applying the coconspirator exception to the MVRA, *courts have conducted fact-*
> *specific inquiries into an **alleged 'victim's' willingness as a participant** in the*
> *scheme and whether he or she **shared the same criminal intent as the defendant***
> *from whom restitution is sought*.  The relevant inquiry is whether the ostensible
> victim was a ***knowing participant*** in the very offense for which the defendant was
> ordered to pay restitution, ***sharing the goals of the defendant***.

850 F. Supp. 2d 176 (D.D.C. 2012) (emphasis added) (citations omitted).[32]  None of this is true

here.  Axiomatically, in the case of a corporate victim, for the co-conspirator exception to apply,

the criminal conduct must be attributable to the corporation under some theory of corporate

criminal liability—such as *respondeat superior*.  The facts here do not support such a finding.

**C.**     **The amount of Petroecuador's losses subject to restitution**

Petroecuador estimates its losses as: (1) the amount paid in bribes on each corruption-

induced contract forming part of the illegal bribery scheme underlying Chatburn's conspiracy; and

(2) the value of Petroecuador employees' honest services for the duration of Chatburn's

participation in the criminal scheme.

---

[32] Every other court that has addressed the issue is of the same opinion.  *See, e.g., United*
*States v. Lazarenko*, 624 F.3d 1247, 1250 (9th Cir. 2010); *United States v. Reifler*, 446 F.3d 65,
127 (2d Cir. 2006)—in both cases the 'victims' to whom restitution was denied were formal
coconspirators named in the government's indictment.  *See also In re Wellcare Health Plans, Inc.*,
754 F.3d 1234, 1240 (11th Cir. 2014) (victim made "unqualified admission that the company was
in fact a co-conspirator"); *In re Instituto Costarricense de Electricidad*, Nos. 11-12707-G, 11-
12708-G (11th Cir. June 17, 2011) (court found the 'victim' company "actually functioned as the
offenders' coconspirator") (unpublished).

Chatburn admits conspiring with at least one vendor that received Petroecuador corruption-induced contracts: GalileoEnergy.  *See* Chatburn Factual Proffer at 2 [DE-213].  GalileoEnergy received approximately $27.8 million in payments from Petroecuador on corruption induced contracts.[33]  Because the bribes were baked into the price of the contracts and disbursed only after Petroecuador made payment to the vendor, Petroecuador is seeking damages on the actual amount of bribes factored into the payments it made on the corruption-induced contracts.

The Eleventh Circuit has made clear that bribe amounts can form the presumptive amount of victim restitution.  *See McNair*, 605 F.3d at 1221 ("the [bribing party] essentially recouped their bribe money by adding it back to their sewer and engineering contract bills as a cost of doing business with the County."); *Vaghela*, 169 F.3d at 736 (the briber or payer of kickbacks "would not have participated in the kickback scheme if it was not profitable," and thus the victim was presumably "overcharged in the amount of the kickbacks").  Indeed, the Government took the same position as Petroecuador in *United States v. Napout*, Case No. 15-CR-252 (PKC), 2018 U.S. Dist. LEXIS 198206 (E.D.N.Y Nov. 20, 2018), that *Vaghela* supported using the bribe amount as the presumptive amount of victim restitution.  The court in *Napout* agreed that this was the holding in *Vaghela*, but found it nonbinding since it is an Eleventh Circuit case.  *Id*. at 23.  Moreover, that analysis is straightforward here: using the 21% bribe commission the United States asserts was paid to the corrupt employees and the 10% Baquerizo admitted paying (a number the United States

---

[33]  These $27.8 million are part of the approximately $40 million in corruption-induced contracts awarded to GalileoEnergy, attached as Exhibit 23.  The difference corresponds to contracts that were anticipatorily cancelled or terminated by Petroecuador upon the discovery of the scheme in May 2016, and therefore on which no payment was made to GalileoEnergy.  *See United States v. Ramiro Andres Luque Flores*, Case No. 17-CR-00537 (CBA), E.D.N.Y., Criminal Information, October 6, 2017, Ex. 9, ¶ 20.

challenged as too law), Petroecuador is entitled to recover as damages, respectively, $5.8 or $2.7 million.[34]

Also well-supported by the Eleventh Circuit, Petroecuador is entitled to recover the value of its employees' honest services (which Petroecuador paid for and did not receive) for the duration of the illegal bribery scheme aided and furthered by Chatburn, estimated by the United States to have lasted from about 2012 through 2016.[35]  *See United States v. Fiorentino*, 149 F. Supp. 3d 1352, 1358-59 (S.D. Fla. 2016) ("Defendants used their positions at Systemax to engage in criminal conduct and in so doing, failed to provide the wholly honest services Systemax paid them to deliver").  These employees include Bravo, Pareja, Escobar and Reyes.  From 2012-2016, these employees cumulatively received $822,514.01 in compensation, including $239,656.39 for Bravo; $323,490.41 for Pareja; $154,082.91 for Escobar; and $105,284.30 for Reyes.[36]  Petroecuador is entitled to recover from Chatburn the entirety of this sum as losses proximately caused by the conspiracy in which Chatburn participated.  *See, e.g., United States v. Odom*, 252 F.3d 1289, 1298 (11th Cir. 2001) (restitution in conspiracy context includes join and several liability for all "reasonably foreseeable acts of others committed in furtherance of the conspiracy").

---

[34] At a minimum, Petroecuador is entitled to recover as damages the $2.9 million in bribe payments Chatburn was personally involved in paying and/or the $2.8 million in bribe monies he was personally involved in laundering.  *See* Chatburn's Factual Proffer at 1, 3 [DE-213].

[35] Chatburn's Superseding Indictment, at 4. *See also United States v. Ramiro Andres Luque Flores*, Case No. 17-CR-537 (CBA), Criminal Information, October 6, 2017, Ex. 9, ¶ 5.

[36] Attached as composite Exhibit 22 is salary information for each of these individuals for the relevant time period.

IV.     **CONCLUSION**

For all of the above reasons, Petroecuador respectfully moves this Court for an order, granting Petroecuador's Motion for Recognition of its Rights as Victim under both the MVRA and CVRA and Entitlement to Restitution, or to allow full briefing and an evidentiary showing in support thereof.

Dated: December 13, 2019

Respectfully submitted,

SQUIRE PATTON BOGGS (US) LLP
200 South Biscayne Boulevard, Suite 4700
Miami, FL 33131

By:  /s/ Raúl B. Mañón
Raúl B. Mañón (FBN 18847)
Telephone: (305) 577-7055
Facsimile: (305) 577-7001
E: raul.manon@squirepb.com

*Counsel for Victim Petitioner*
*Empresa Pública de Hidrocarburos del*
*Ecuador – EP Petroecuador*

Of counsel

Franklin Monsour
Admitted in New York (*pro hac vice* to be filed)
SQUIRE PATTON BOGGS (US) LLP
30 Rockefeller Plaza, 23rd Floor
New York, New York 10112
T.: 212 872 9800
Facsimile: 212 872 9815
E: Franklin.monsour@squirepb.com

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 13th day of December, 2019, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system.


*/s/ Raúl B. Mañón*
Raúl B. Mañón